Jimmie V. OWENS, Appellant,

v.

UNITED STATES, Appellee.

No. 83–1171.

District of Columbia Court of Appeals.

Submitted Nov. 26, 1984.

Decided Aug. 30, 1985.

Gregory C. Powell, Riverdale, Md., was on brief for appellant.

Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Donald J. Allison, and Kenneth W. Cowgill, Asst. U.S. Attys., Washington, D.C., were on brief for appellee.

Before MACK and TERRY, Associate Judges, and PAIR, Associate Judge, Retired.

TERRY, Associate Judge:

Appellant was charged by indictment with assault with intent to commit robbery

while armed (count one)[1] and assault with intent to kill while armed (count two).[2] A jury found him guilty as charged on count one, and guilty of the lesser included offense of assault with a dangerous weapon[3] (count three). On appeal he advances four arguments for reversal; we reject them all and affirm both convictions.

## I

One evening in December 1982, shortly after 9:00 p.m., James Cook left his house on Twenty-Second Street, S.E., near Alabama Avenue, to buy a loaf of bread and a soft drink at a nearby shopping center. He walked along Twenty-Second Street and then decided to take a shortcut through an alley. In the alley, however, he was confronted by three men walking toward him, two of whom were holding pistols at their sides. When the three men were about fifteen feet away from him, they looked at him, and one of them said, "This is it." He asked, "Like what? What is it?", to which came the response, "Like you know what it is."

As the trio came closer, Mr. Cook, who had an injured ankle, turned and tried to flee into a nearby parking lot. As he hobbled away, however, he heard two shots fired, one of which struck him in the right thigh. The attackers then ran out of the alley toward Twenty-Second Street. A man sitting in a car in the parking lot took Mr. Cook to the hospital.

By coincidence Metropolitan Police Detective Marvin Jacobs was sitting in an unmarked police car in an Exxon station at Twenty-Second Street and Alabama Avenue, S.E., where he had stopped to purchase a pack of cigarettes. His car was facing Twenty-Second Street, and he was about 100 to 150 feet away from the alley. Although it was December, his car window was open, and through it he heard the two gunshots. He immediately started his car, and as he drove out of the gas station onto Twenty-Second Street, he saw three men running out of a nearby alley. With his view unobstructed, Detective Jacobs watched the men as they ran toward a brown Oldsmobile which was parked on the street. When they got into the car, Jacobs was only twenty to thirty feet away from them.

The three suspects drove down Twenty-Second Street at a high rate of speed; Jacobs followed them closely and radioed the police dispatcher for assistance. He trailed the Oldsmobile for several blocks, stopping right behind it at a traffic light at Stanton Road and Alabama Avenue. As both cars sat waiting for the light to turn green, the siren and flashing light of a nearby police cruister attracted Jacobs' attention. The Oldsmobile lurched forward as soon as the light changed to green, and it was off again at high speed. The Oldsmobile then made a sharp left turn onto Congress Place, where a bus had completely blocked the street. The car crashed into the bus, but before it did, the two men in the front seat jumped out and ran away. Although Detective Jacobs chased one of them for a short distance, both of them managed to escape.

Appellant, who had been riding in the back seat, was not so lucky. Officer Larry McCoy had responded to the radio run and was directly behind Detective Jacobs in his police cruiser when the Oldsmobile collided with the bus. As appellant ran from the Oldsmobile, McCoy gave chase. Appellant briefly disappeared from view when he turned a corner and ran into a courtyard, but McCoy caught and arrested him a moment later when he ran back out of the courtyard.

Detective Jacobs never lost sight of the three suspects from the time they ran from the alley until the time of the crash, and no one else got into or out of the suspects' car during that time. After appellant's arrest, Detective Jacobs searched the Oldsmobile.

---

1. D.C.Code §§ 22–501, 22–3202 (1981).

2. D.C.Code §§ 22–501, 22–3202 (1981).

3. D.C.Code § 22–502 (1981).

He found various items which were not introduced into evidence, but no weapons.

About a month later, Mr. Cook was shown a photograph of a lineup and picked out appellant as one of his assailants.[4] He also identified appellant in court as one of the gunmen.

At trial appellant did not testify and called no witnesses. Defense counsel relied instead on his ability to cross-examine the complainant and discredit his testimony. Counsel brought out that Mr. Cook had had a few beers before going to the store. He also established that Cook had testified before the grand jury that he had no money with him at the time of the shooting, whereas at trial he said that he had about a dollar. In addition, counsel tried to show that Mr. Cook had given a more detailed description of his assailants than a police officer had placed in his report.

## II

Appellant first challenges the court's denial of his motion for judgment of acquittal on the first count of the indictment. He contends that the words used by Mr. Cook's assailants were insufficient to prove a specific intent to commit robbery.

An intent to commit robbery may be inferred not only from the words uttered by the suspect but also from his conduct or from the "totality of the evidence." *Dowtin v. United States*, 330 A.2d 749, 750 (D.C.1975); *see Singleton v. United States*, 488 A.2d 1365, 1367 (D.C. 1985); *Accardo v. United States*, 102 U.S. App.D.C. 4, 249 F.2d 519 (1957), *cert. denied*, 356 U.S. 943, 78 S.Ct. 787, 2 L.Ed.2d 817 (1958). There is no requirement that a defendant announce his intent. *Singleton v. United States, supra*, 488 A.2d at 1367; *cf. United States v. Bridges*, 139 U.S.App. D.C. 259, 261, 432 F.2d 692, 694 (1970).[5]

In *Singleton v. United States, supra*, this court rejected a claim that the government failed to prove that the defendant intended to rob the complainant because the evidence did not establish that the defendant demanded money or announced his intent to rob. Instead, we held that the jury could infer such an intent from the complainant's testimony that the defendant was reaching for his hip pocket, where he kept his wallet, but was unable to remove the wallet because the complainant was struggling to keep him from doing so. Likewise, in *Accardo v. United States, supra*, the court held that the jury could reasonably infer an intent to rob from testimony that the defendant walked up to a gas station proprietor who was closing the station for the night, pulled out a gun, and told the proprietor through an open window, "Now, you go over and unlock that door. I'm coming in." As the court explained, "The witness could have been under no delusion as to the visitor's intent when, as he testified, he 'looked up and into the muzzle of an automatic pistol.'" 104 U.S.App.D.C. at 4, 249 F.2d at 519.

In the case at bar, Mr. Cook surely "could have been under no delusion" when he was approached in an alley at night by three strangers, two of whom were brandishing pistols. When they confronted him saying, "This is it," he asked, "Like what? What is it," to which they responded, "Like you know what it is." Mr. Cook then attempted to escape and was

---

**4.** Mr. Cook testified that the lighting in the alley was "fair." Although there were no street lights in the alley, it was illuminated by the lights from the shopping center and a nearby apartment building.

**5.** In *Bridges, supra*, the defendant walked toward the victim with a gun in his hand, shot her, and then walked away without rendering any aid. The shooting took place in front of the victim's home, but far from the defendant's home. The court held that this evidence was sufficient to establish a specific intent to kill. Although the court also noted that the defendant "indicated his intent by saying, 'I will kill you,' almost simultaneously with firing the gun," it specifically did not consider this statement in ruling that the evidence of intent to kill was sufficient. 139 U.S.App.D.C. at 261, 432 F.2d at 694.

shot while doing so. After the shots were fired, the assailants fled. Viewing the totality of the evidence in the light most favorable to the government, as we must, *Crawford v. United States,* 126 U.S.App. D.C. 156, 375 F.2d 332 (1962), we conclude that a jury could reasonably have found that the three assailants intended to rob Mr. Cook when they accosted him in the alley. We therefore hold, on the authority of *Singleton* and *Accardo,* that the court properly denied appellant's motion for judgment of acquittal.[6]

### III

Appellant asserts that a remark made by the prosecutor during his opening statement was not supported by the evidence produced at trial, and that this act of alleged prosecutorial misconduct deprived him of a fair trial. We find no misconduct and no ground for reversal.

In his opening statement, the prosecutor said that the three assailants threatened Mr. Cook by saying, "You know what this is? Give it up!" The prosecutor immediately qualified his statement by adding, "Words to that effect." As it turned out, there was no evidence that the words "give it up" were spoken by any of the assailants; the evidence established only that they said, "This is it" and "You know what it is." In order to decide whether the prosecutor's misstatement requires reversal, we must first determine whether it amounted to misconduct, and if so, whether it was so prejudicial that it deprived appellant of a fair trial.

"The purpose of an opening [statement] is to give the broad outlines of the case to enable the jury to comprehend it." *Government of the Virgin Islands v. Turner,* 409 F.2d 102, 103 (3d Cir.1968). But "[t]he law does not require that opening trial statements be completely sup-

ported by evidence introduced during the trial. Such a rule, rigidly enforced, would effectively eliminate opening remarks and deprive the jury of a very useful outline of the trial...." *Mares v. United States,* 409 F.2d 1083, 1085 (10th Cir.1968), *cert. denied,* 394 U.S. 963, 89 S.Ct. 1314, 22 L.Ed.2d 564 (1969), quoted in *Robinson v. United States,* 361 A.2d 199, 200 (D.C. 1976). In this case the prosecutor made clear that he was only paraphrasing the words of the assailants when he used the phrase "Words to that effect." He was merely summarizing the evidence as he expected it to develop, and, as we have already held, it was not unreasonable to interpret the words and conduct of the three assailants as bespeaking an intent to rob Mr. Cook.

Appellant's principal argument is the prosecutor's misstatement must have impermissibly swayed at least some of the jurors. To support his contention, he cites a discussion at the bench concerning his motion for judgment of acquittal on the charge of assault with intent to commit robbery. In denying the motion, the court remarked that the assailants had said, "Give it up." Defense counsel had to remind the court, "That was in his opening statement. That wasn't testimony." Appellant contends that this mistaken recollection by the court proves that the prosecutor's statement had a substantial impact on the case. Although it is possible that the court did confuse the opening statement with Mr. Cook's testimony, it is also possible that the court simply remembered the testimony in that way. The government also points out that the prosecutor, in his closing argument, correctly recalled the testimony, and that no reference to "Give it up" was ever made after the opening statement.

---

**6.** Appellant also argues that the evidence was insufficient to sustain his conviction of assault with a dangerous weapon because there was no evidence that he aided and abetted the assault. He concedes, however, that the complainant identified him as one of the two men carrying pistols. That fact alone is sufficient to justify rejection of appellant's argument. *See, e.g., Creek v. United States,* 324 A.2d 688 (D.C.1974); *In re Reeder,* 264 A.2d 893 (D.C.1970); *Corbin v. United States,* 237 A.2d 466 (D.C.1968).

We are guided in our resolution of this issue by the Supreme Court's decision in *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). In *Frazier* the Court held that the defendant was not denied a fair trial simply because the prosecutor, in his opening statement, summarized the expected testimony of a witness who later refused to testify. In so holding, the Court emphasized that the summary was given "not during the trial ... but in an opening statement. In addition, the jury was told that the opening statement should not be considered as evidence." *Id.* at 735, 89 S.Ct. at 1422. The standard limiting instructions given by the trial court were held to be sufficient to cure the error because the "jury was not being asked to perform ... mental gymnastics" in disregarding the statement, as it would be, for example, if it were required to consider "an incriminating statement against only one of two defendants in a joint trial." *Id.* The Court explained further that the jury was not likely to be influenced by the summary since it was "not touted to the jury as a crucial part of the prosecution's case...." *Id.* at 736, 89 S.Ct. at 1423. Finally, the court concluded that "[a] more specific limiting instruction might have been desirable, but none was requested." *Id.* at 735 n. *, 89 S.Ct. at 1422.

■■■■ In this case, as in *Frazier*, the challenged remark was made during the prosecutor's opening statement and not during the trial, the jury was instructed that the opening statement should not be considered as evidence,[7] the instruction did not require the jurors to perform "mental

gymnastics," the remark was not "touted" to the jury as critical,[8] it was not vitally important,[9] and, although a more particularized limiting instruction might have been helpful, none was requested. Moreover, in this case the person whose testimony was summarized actually testified, enabling the jury to compare his testimony with the proffer in the opening statement. The situation here was thus less prejudicial than in *Frazier*. For all of these reasons, we are convinced that there was no reversible error in the prosecutor's opening statement.

## IV

■■■■ Appellant maintains that because the jurors may have been in disagreement about the facts upon which each conviction was based, the court erred in simply giving the jury the standard unanimity instruction rather than a more particularized one. No objection, however, was made at trial to the jury instructions, and therefore we can reverse only if the record demonstrates plain error, *i.e.*, error "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts v. United States*, 362 A.2d 706, 709 (D.C. 1976) (en banc) (citations omitted). We find no such error.

■■■■ The Sixth Amendment gives to a defendant the right to have his fate decided by a unanimous verdict. *Andres v. United States*, 333 U.S. 740, 748, 68 S.Ct. 880, 884, 92 L.Ed. 1055 (1948). That right is reinforced by Super.Ct.Crim.R. 31(a).[10] "The unanimity rule ... requires jurors to be in substantial agreement as to just what a

---

7. We may presume that the jury understood and followed the court's instructions. *Hall v. United States*, 84 U.S.App.D.C. 209, 211, 171 F.2d 347, 349 (1948).

8. *Compare Jackson v. United States*, 329 A.2d 782, 790 (D.C.1974), *cert. denied*, 423 U.S. 851, 96 S.Ct. 95, 46 L.Ed.2d 74 (1975) (error not reversible when the prosecutor made a misstatement during his opening argument which was never repeated) *with (Kenneth) Jones v. United States*, 119 U.S.App.D.C. 213, 214, 338 F.2d 553, 554 (1964) (error reversible in a "paper-thin" case when, "on three separate occasions during

a one-day trial, Government counsel sought to shore up obvious weaknesses in the Government's case" by repeating statements which were not supported by evidence).

9. The government is not required to prove that the defendant announced his intent. *Singleton v. United States, supra*, 488 A.2d at 1367.

10. Rule 31(a) provides:
 *Return.* The verdict shall be unanimous. It shall be returned by the jury to the judge in open court.

defendant did as a step preliminary to determining whether the defendant is guilty of the crime charged." *United States v. Gipson,* 553 F.2d 453, 457–458 (5th Cir. 1977), quoted in *Johnson v. United States,* 398 A.2d 354, 369 (D.C.1979); *accord, Derrington v. United States,* 488 A.2d 1314, 1335 (D.C.1985) (citing cases).

■■■ There is no danger of a non-unanimous verdict when one charge encompasses only a single incident. *Tyler v. United States,* 495 A.2d 1180, 1182 (D.C. 1985); *Gordon v. United States,* 466 A.2d 1226, 1234 (D.C.1983); *Burrell v. United States,* 455 A.2d 1373, 1379–1380 (D.C. 1983); *Barkley v. United States,* 455 A.2d 412, 415 (D.C.1983). However, when one charge involves two separate incidents, the court must instruct the jurors that they must be unanimous as to which incident they rely upon as a basis for their verdict. *E.g., Davis v. United States,* 448 A.2d 242, 244 (D.C.1982); *Hack v. United States,* 445 A.2d 634, 641 (D.C.1982); *Hawkins v. United States,* 434 A.2d 446, 449 (D.C.1981). If the two incidents are charged separately, as in this case,[11] the danger of a non-unanimous verdict is greatly reduced. *See (Jackie) Irby v. United States,* 464 A.2d 136, 140 (D.C.1983).

■■■ In order to decide whether the court erred in failing to give a particularized unanimity instruction, we must consider the asserted error in the context of the entire trial, because "a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge." *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); *see United States v. Park,* 421 U.S. 658, 675, 95 S.Ct. 1903, 1913, 44 L.Ed.2d 489 (1975); *(Jackie) Irby v. United States,*

*supra,* 464 A.2d at 140 (discussing the relationship of the verdict form to the likelihood of a unanimous verdict); *Davis v. United States, supra,* 448 A.2d at 244 (considering statements of the prosecutor and the court to the jury to determine the need for a particularized unanimity instruction). On the other hand, we cannot indulge in speculation about the jury's thought processes, and thus we must disregard appellant's conjectures as to how the jury may have arrived at its verdict.[12] ·

■■■ During his closing argument, the prosecutor made clear to the jury that the attempted robbery and the shooting were separate incidents and that only the charge of assault with intent to kill while armed was based on the shooting:

Ladies and gentlemen, the government submits to you that when you fire a gun twice at someone as they turn to get away from you, you are trying to kill him. Except for the fact that one bullet missed Mr. Cook and the other one hit him in the thigh, the rear of the thigh, they might have succeeded.

Ladies and gentlemen, the government asks you to review that evidence carefully, to go over it. When you do, we submit to you that there is only one verdict that is appropriate in this case, and that is, that Mr. Owens is guilty of assaulting Mr. Cook with the intent to rob him while armed with a pistol, and that he is guilty of assaulting Mr. Cook with the intent to kill him while armed with a pistol.

Defense counsel also emphasized that the shooting related only to the charge of assault with intent to kill:

The government has to prove in the assault with intent to kill that whoever shot—shot Mr. Cook—whoever shot Mr.

---

11. As we shall explain in part V, *infra,* the evidence in this case established that there were two separate criminal incidents rather than a single continuous one.

12. Appellant suggests that some of the jurors may have voted to find him guilty of assault

with intent to commit robbery solely on the basis of the shooting, and that others may have found him guilty of assault with a dangerous weapon only on the basis of the attempted robbery. There is no support in the record for either speculation.

Cook intended to kill him—intended to kill him.

Where is the evidence in this case of any intent to kill anyone? If you shoot someone, is that an intent to kill? Is it? If you shoot someone, you might intend to wound him. You might have intended to miss him. You might have been shooting at something else.

How do you prove something like that? How do you prove that intent? That is easy. The facts and circumstances surrounding the shooting. The shooting in the leg? Does that prove an intent to kill?

The prosecutor then explained in his rebuttal argument that the jury could find appellant guilty of the lesser included offense of assault with a dangerous weapon if it found that even though appellant or one of his companions shot the complainant, he had no intent to kill him:

Intent is a state of mind, and the only way that you can actually understand what somebody's intent is, is to look at the circumstances. Two shots in an alley, in the back, at night, in the course of a robbery.

Even if you should find that that is not enough, His Honor will instruct you that there is a lesser included offense of assault with intent to kill while armed, and that is, assault with a dangerous weapon.

For that you don't have to even find intent to kill. All you have to find is that Mr. Cook was assaulted by Mr. Owens or one of Mr. Owens' buddies, with a dangerous weapon, a gun. That, ladies and gentlemen, is absolutely clear because that is the objective fact, not the working of a human mind.

Following counsel's closing arguments, the court gave the standard instruction on assault with a dangerous weapon and also told the jury, "Your verdict must be unanimous." *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.69 (3d ed. 1978). The court then gave a verdict form to the jury, noting that there was no objection to it. The verdict form was as follows:

### VERDICT

We, the Jury in the above captioned case, find the Defendant, Jimmie V. Owens, as to:

COUNT ONE: Assault with intent to Commit Robbery While Armed

Guilty____ Not Guilty

COUNT TWO, Assault with intent to Kill While Armed

Guilty____ Not Guilty____

If you find the Defendant Guilty in Count Two above, you need not consider Count Three below. However, if you find the Defendant Not Guilty in Count Two, you *must* consider Count Three.

COUNT THREE, Assault with a Dangerous Weapon

Guilty____ Not Guilty____

After reviewing the entire record, we cannot accept appellant's contention that the jurors may have disagreed about which facts formed the basis of each charge. The arguments of the prosecutor and defense counsel, taken together with the verdict form and the jury instructions, made clear to the jury that the shooting related only to the charge of assault with intent to kill while armed, of which assault with a dangerous weapon was a lesser included offense. There is no rational way to conclude that the jury may have based its verdict on count one (assault with intent to commit robbery while armed) on the shooting, which occurred after the first assault had ended. Thus we find no plain error in the trial court's failure to give a more particularized unanimity instruction.

### V

Appellant's final contention is that the court's imposition of consecutive sentences in this case violated the Double Jeopardy Clause of the Fifth Amendment. We reject his argument because the Fifth Amendment does not prohibit separate and

cumulative punishment for separate criminal acts.

■■■ The Double Jeopardy Clause not only prevents the government from bringing a defendant to trial more than once for the same offense, *e.g.*, *Green v. United States*, 355 U.S. 184, 187, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957), but also "protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). This means that the imposition of consecutive sentences for the same act may violate the Double Jeopardy Clause. *E.g.*, *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977); *Bell v. United States*, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955). Whether it does so, however, depends on the intent of the legislature. *Ohio v. Johnson*, 467 U.S. 493, 104 S.Ct. 2536, 2541, 81 L.Ed.2d 425 (1984); *Missouri v. Hunter*, 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983). In the District of Columbia that intent is clear: by enacting D.C.Code § 23–112 (1981), Congress intended that consecutive sentences be imposed for all offenses which are not the same offense under the test established in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), unless the sentencing court expressly states otherwise.[13] *See Whalen v. United States*, 445 U.S. 684, 690–693, 100 S.Ct. 1432, 1437–1438, 63 L.Ed.2d 715 (1980). The question that we must answer, then, is whether the two offenses of which appellant was convicted constitute the same offense within the meaning of *Blockburger*.

The defendant in *Blockburger* was convicted of violating the Harrison Narcotic Act by making two sales of a prohibited drug. The Supreme Court held that the Act made each sale a separate offense, and that the issue therefore was whether he had engaged in a single continuous sale or whether he had made two separate and distinct ones. The Court ruled that each sale was a separate offense since each was driven by a different "impulse":

> Each of several successive sales constitutes a distinct offense, however closely they may follow each other. The distinction stated by Mr. Wharton is that "when the impulse is single, but one indictment lies, no matter how long the action may continue. If successive impulses are separately given, even though all unite in swelling a common stream of action, separate indictments lie."

> \*　\*　\*　\*　\*　\*

> In the present case, the first transaction, resulting in a sale, had come to an end. The next sale was not the result of the original impulse, but of a fresh one—that is to say, of a new bargain.

284 U.S. at 302–303, 52 S.Ct. at 181–182 (citation omitted). Another way of stating the "impulse" test was offered by Judge Leventhal in his concurring opinion in *(Roy) Irby v. United States*, 129 U.S.App. D.C. 17, 22–23, 390 F.2d 432, 437–438 (1967) (en banc):

> If at the scene of the crime the defendant can be said to have realized that he has come to a fork in the road, and nevertheless decides to invade a different interest, then his successive intentions make him subject to cumulative punishment, and he must be treated as accepting that risk, whether he in fact knows of it or not. [Footnote omitted.]

Thus we must determine, first, whether appellant or his accomplice reached a "fork in the road" after the attempted robbery failed when the complainant turned and started to run away, and second, whether appellant or his accomplice nevertheless decided, as a result of a new "impulse," to

**13.** Section 23–112 provides:

A sentence imposed on a person for conviction of an offense shall, unless the court imposing such sentence expressly provides otherwise, run consecutively to any other sentence imposed on such person for conviction of an offense, whether or not the offense (1) arises out of another transaction, or (2) arises out of the same transaction and requires proof of a fact which the other does not.

invade a different interest by shooting the complainant in the leg.

Some crimes, by their very nature, tend to be committed in a single continuous episode rather than in a series of individually chargeable acts. An ordinary assault, for example—that is, an assault that is not accompanied by an intent to commit another offense—is usually such a crime. "The fact that a criminal episode of assault involves several blows or wounds, and different methods of administration, does not convert it into a case of multiple crimes for purposes of sentencing." *Smith v. United States,* 135 U.S.App.D.C. 284, 285, 418 F.2d 1120, 1121, *cert. denied,* 396 U.S. 936, 90 S.Ct. 280, 24 L.Ed.2d 235 (1969); *see Glymph v. United States,* 490 A.2d 1157, 1160–1161 (D.C.1985). Joyriding is another example of this type of continuing crime. *See Brown v. Ohio, supra,* 432 U.S. at 169, 97 S.Ct. at 2227 (nine-day joyride constituted a single offense); *accord, e.g., Parker v. United States,* 476 A.2d 173, 176 (D.C. 1984) (four-day joyride). Other crimes, however are not so continuous. In the case of a robbery, for example, a separate charge may be sustained for each successive taking. *(Steven) Jones v. United States,* 362 A.2d 718, 719–720 (D.C.1976) (taking of money from cash register and from salesclerk's purse held to be two separate offenses, even though there was only one victim); *Barringer v. United States,* 130 U.S.App.D.C. 186, 187, 399 F.2d 557, 558 (1968), *cert. denied,* 393 U.S. 1057, 89 S.Ct. 697, 21 L.Ed.2d 698 (1969) (robbery of two victims at the same time and place justified separate convictions and consecutive sentences, since "the robbery statute was designed to safeguard individual citi-

zens from being robbed").[14] A robbery—or an attempted robbery, as in this case—tends to be completed quickly and to leave the perpetrator at a fork in the road where he must consider whether to retreat or to invade another interest. For this reason robbery is often accompanied by other crimes. *E.g., Bates v. United States,* 327 A.2d 542 (D.C.1974); *Dixon v. United States,* 320 A.2d 318 (D.C.1974).

 A second factor to consider is whether the defendant's conduct constitutes more than one kind of offense. When, for example, a person not only robs but also assaults the victim after the robbery is completed, the assault will be treated as a separate offense. *Bates v. United States, supra,* 327 A.2d at 546–547; *Dixon v. United States, supra,* 320 A.2d at 321. In such a case, the defendant has reached a fork in the road after the robbery, but has decided to invade another interest. The same may not be true, however, when an assault is committed in order to effect the robbery. *E.g., Leftwitch v. United States,* 460 A.2d 993, 994, 996–997 (D.C.1983). When this happens, the assault is usually not regarded as a separate offense, but rather as an aggravating factor to be considered in sentencing. *Cf. (Roy) Irby v. United States, supra,* 129 U.S.App.D.C. at 21, 390 F.2d at 436 (Leventhal, J., concurring).

 Finally,[15] the duration of the criminal episode may be significant in resolving a *Blockburger* issue. In general, the more time that is involved, the greater is the chance that the defendant has reached the fork in the road. *See, e.g.,*

---

**14.** *But see (Ulysses) Jones v. United States,* 483 A.2d 1149 (D.C.1984), *cert. denied,* — U.S. —, 105 S.Ct. 2363, 86 L.Ed.2d 263 (1985), in which convictions of felony murder based on two underlying robberies were upheld on the theory that the two robberies were part of "a continuous joint venture" by the defendants. Significantly for this case, the court noted that "there was no break in the continuity of events" and that the evidence established that the defendants "were engaged jointly in the perpetration of a 'general hold-up,' ... which encompassed both

the store itself and any other victims they chose to rob while inside." *Id.* at 1152 (citations omitted).

**15.** Other factors not relevant to the present case may also be considered, such as the number of victims, *see Murray v. United States,* 358 A.2d 314, 320–322 (D.C.1976); *Barringer v. United States, supra,* and whether the criminal acts occurred in different places, *see Tuckson v. United States,* 364 A.2d 138, 142 (D.C.1976).

*Perkins v. United States,* 446 A.2d 19, 26 (D.C.1982) ("Since the episode occurred over a long period [one and one-half hours] and numerous weapons were used before and after the demand for money, it cannot be said that the events were so unitary as to present a situation where merger is arguable"). The length of time, however, is usually not dispositive. As the Supreme Court recognized in *Blockburger,* "[e]ach of several successive sales constitutes a distinct offense, however closely they may follow each other." 284 U.S. at 302, 52 S.Ct. at 181. The amount of time consumed by the defendant's criminal conduct must therefore be considered in relation to the nature of the offense. *Compare Brown v. Ohio, supra,* 432 U.S. at 169, 97 S.Ct. at 2227 (nine-day joyride held to be a single offense), and *Glymph v. United States, supra,* 490 A.2d at 1160 (series of beatings and kickings extending over an hour held to be "not a succession of detached incidents but a continuing course of assaultive conduct"), *with Bates v. United States, supra,* 327 A.2d at 546–547 (robbery committed at the front of a store, followed only moments later by an assault in the rear of the store, held to be separate offenses).

▮ This case arises from an attempted robbery, a crime that tends to be committed quickly and therefore commonly brings the defendant to the fork in the road more rapidly than other crimes. Appellant's plan to rob Mr. Cook went sour when Cook turned away and attempted to flee. At that moment appellant reached the fork in the road; the subsequent shooting of Mr. Cook invaded a separate interest, and thus it constituted a separate offense. Thus we hold that appellant's two convictions were based on two separate criminal acts, one of which ended before the other began. Consecutive sentences were therefore permissible under the Double Jeopardy Clause and the many cases which have followed *Blockburger,* particularly this court's decisions in *Bates, Dixon,* and *(Steven) Jones.*

*Affirmed.*