Bobie WILSON, Appellant,

v.

UNITED STATES, Appellee.

No. 86–76.

District of Columbia Court of Appeals.

Submitted Feb. 2, 1987.
Decided April 9, 1987.*

Felicia Dubrovsky, appointed by this court, was on brief, for appellant.

David M. Gaouette, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Michael W. Farrell and Judith Hetherton, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before BELSON and ROGERS, Associate Judges, and PAIR, Senior Judge.

PAIR, Senior Judge:

As a result of a February 3, 1985 incident, an indictment was filed charging appellant with two counts of assault with intent to kill while armed, D.C.Code §§ 22–501, –3202 (1981), and one count of malicious disfigurement while armed, id. §§ 22–506, –3202. A jury convicted appellant of assaulting Eddie Cooper with intent to kill while armed, maliciously disfiguring

* A Memorandum Opinion and Judgment in this case was entered on April 9, 1987. It is being published pursuant to this court's order granting the motion of appellee for publication.

Eddie Cooper while armed, and assaulting William Jordan with a dangerous weapon, a lesser-included offense of assault with intent to kill, *id.* § 22–502. On December 2, 1985, appellant received concurrent sentences of ten years to life for assault with intent to kill while armed and ten to thirty years for malicious disfigurement while armed, and a consecutive sentence of three to ten years for assault with a dangerous weapon.[1] On appeal appellant urges a number of grounds upon which his convictions should be overturned. Perceiving no reversible error, we affirm.

## I

In the early morning of Sunday, February 3, 1985, appellant visited his girlfriend, Jackie Clinton, who lived in the apartment building at 704 Third Street, N.W., with her family. While William Jordan and Steve Glover, residents of the same building, were in the lobby later that morning, Clinton ran to them seeking protection from appellant, who she claimed was trying to kill her. Appellant and Jordan, who did not know each other, then exchanged words which ended with appellant threatening to beat up Jordan. Jordan made clear to appellant that he was not afraid of him, did not appreciate his threats, and attempted to calm appellant. Jordan sent Clinton to his apartment to stay with his wife and appellant returned to Clinton's apartment.

When appellant got to Clinton's apartment, he told Clinton's brother, Liggins, that there were some fellows down in the lobby who wanted to jump him and asked Liggins if he would come downstairs with him. Liggins went down to the lobby with appellant, thinking that appellant was just going to leave the building. According to Glover, appellant came back to the lobby with his hand in his pocket, and provoked trouble. Jordan thought that appellant

was going out the door. Appellant, however, walked directly up to Jordan, said something to him, punched him in the mouth, and then stabbed him in the back with a knife. Jordan felt something stick in his back and could feel blood running down his back, but neither Jordan nor Glover saw the knife until Jordan had already been stabbed. Liggins, Glover and Jordan all agreed that Jordan was unarmed and had done nothing to appellant before appellant struck him.

Meanwhile, Eddie Cooper, also a resident of the building, heard the fracas in the lobby. He picked up a stick he used for protection and exited his apartment with the stick in one hand.[2] As Cooper came around the corner toward the lobby, appellant was getting up off the floor. He started running toward the front door, but when he saw Cooper he began yelling and ran directly at him, even though there was plenty of room for him to go around Cooper. Appellant raised both his arms as he ran toward Cooper. Cooper feared that appellant had a weapon and would hit him and kill him, so he raised his stick to protect himself. Only then did Cooper see appellant's knife, which slashed Cooper's face from his temple, through his nose, his lip, and the side of his mouth. Cooper, who had not said or done anything to appellant prior to the attack, was bleeding severely and in serious condition.

After cutting Cooper, appellant ran out of the building into the street. When Glover, Liggins and Jordan realized that appellant was gone, they pursued him. Liggins, Jordan and Glover all testified that they were chasing appellant either to prevent his escape or to hold him for the police.

The chase proceeded down Fourth Street. Appellant ran until he encountered a Federal Protective Service officer. Appellant

---

1. Prior to trial, the government filed a notice that pursuant to D.C.Code § 22–104 (1981), appellant was subject to an enhanced sentence of up to life imprisonment on each felony count of which he might be convicted, based upon his three prior felony convictions.

2. Cooper testified that he kept the stick by the door of his apartment and frequently carried it

with him in the hallway because there had been a number of quarrels inside the building resulting in the police being called. However, he had never used the stick to strike anyone and had never been involved in any of the fights. Jordan described the stick as about fourteen to sixteen inches long and Glover described it as "a little chair arm."

was eventually taken back to the apartment building where he was positively identified by Cooper and Jordan before they were taken to the hospital. Cooper underwent an eight and a half hour operation and received 138 stitches in his face. He returned to the hospital three more times before the trial and had an appointment to go back after the trial. Jordan was also treated at the hospital for a stab wound that left a permanent scar on his back.

Metropolitan Police Officer James Cloud, who had responded to a radio broadcast for an assault at 704 Third Street, N.W., testified regarding the identifications of appellant by Cooper and Jordan. On cross-examination, appellant's counsel elicited the fact that Cloud had spoken to Clinton who told him that she and appellant had gotten into an argument in the hallway and outside and that when appellant threatened her, she had attempted to flee from him. Clinton told the officer that appellant then got into an argument with Jordan.

Jackie Clinton testified in appellant's defense that she had asked him to come to her apartment and give her some money. He arrived at about 8:00 or 8:30 a.m. and they talked. Clinton admitted hiding behind Jordan and asking him to help her because she did not want to go back home with appellant. She claimed, however, that she could not remember having any bad words with appellant or whether she was upset, noting she had drunk about three half pints that morning. She claimed she did not see appellant assault Cooper be-

cause she came on the scene after Cooper had been cut. On cross-examination, after she was confronted with her prior grand jury testimony, Clinton admitted that appellant had been "snatching" on her that day, that Jordan and Glover got involved in the matter only to protect her, that appellant was not in any danger when he stabbed Cooper, and that she had tried to pull appellant off Cooper because she knew appellant was wrong.

## II

We focus only on appellant's contention that the trial [court violated the proscription against double jeopardy when it imposed concurrent sentences for assault with intent to kill Cooper while armed and malicious disfigurement of Cooper while armed.] Appellant's remaining challenges are all without substance and thus merit little discussion. These include the claims that the trial court committed reversible error by giving a flight instruction over appellant's objection;[3] the misconduct of the prosecuting attorney in his closing remarks prejudiced appellant so as to deprive him of a fair and impartial trial;[4] the trial court committed reversible error by failing, *sua sponte*, to give an immediate cautionary instruction that Clinton's grand jury testimony could be used for impeachment only and not as evidence;[5] and the trial court committed reversible error in failing to apply the self defense instructions specifically to the malicious disfigurement charge.[6]

---

**3.** We find ample evidence from which the jury reasonably could conclude that appellant did flee, and that the flight was indicative of consciousness of guilt and actual guilt, and thus the instruction was permissible. *Scott v. United States,* 412 A.2d 364, 371 (D.C.1980).

**4.** The record before us demonstrates that any errors in the prosecutor's closing argument did not constitute plain error. *McCowan v. United States,* 458 A.2d 1191, 1196–97 (D.C.1983).

**5.** Given appellant's failure to request a limiting instruction and the fact that the jury was instructed on the limited use of prior inconsistent statements at the end of all instructions, the court did not commit plain error in failing to give, *sua sponte,* an immediate cautionary instruction. *Johnson v. United States,* 387 A.2d 1084, 1089 (D.C.1978). We note that the im-

peachment here, whether appellant had slapped Clinton, as compared to the totally inculpatory statement at issue in *Johnson,* is minor in nature.

**6.** Appellant's argument here is two-part. First, he submits that the trial court committed reversible error when it neglected to apply the self defense instruction specifically to the malicious disfigurement charge. Because appellant failed to comply with Super.Ct.Crim.R. 30, this claim of error must be judged under the plain error standard. Appellant not only never requested that the court specifically apply the self defense instructions to malicious disfigurement, but, in fact agreed with the court's proposal not to do so and raised no objection when final instructions were given. *Watts v. U.S.,* 362 A.2d 706, 709 (D.C.1976). Without deciding whether the

## III

Appellant was convicted of violating two distinct statutory provisions with respect to his attack on Cooper, D.C.Code §§ 22–501, –506, for which he received separate, concurrent sentences. Appellant urges that the trial court erred in imposing concurrent sentences as the malicious disfigurement was the result of a single assault on Cooper with the intent to kill. Thus, even though his conduct violated two separate criminal statutes, he could be sentenced for only one of the convictions.[7] We disagree.

■■■ The Double Jeopardy Clause of the Fifth Amendment protects against multiple punishments for the same offense, *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). However, it is well established that a single transaction may result in distinct offenses under separate statutes without violating the Double Jeopardy Clause. *Albernaz v. United States*, 450 U.S. 333, 344–45 n. 3, 101 S.Ct. 1137, 1145 n. 3, 67 L.Ed.2d 275 (1981). When it appears that more than one statutory violation has arisen from a single act, the central question is what punishment the legislature intended to authorize for the relevant offenses; and if Congress intended to impose

multiple punishments, imposition of such sentences does not run afoul of the Double Jeopardy Clause. *Id.*, 450 U.S. at 344, 101 S.Ct. at 1145.

In determining whether cumulative sentences offend constitutional requirements, we begin our analysis with the test set out in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932):

> [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not.

*Id.* 284 U.S. at 304, 52 S.Ct. at 182.

This rule of statutory construction is embodied in D.C.Code § 23–112 (1981).[8] As we noted in *Owens v. United States*, 497 A.2d 1086 (D.C.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986), the intent of the D.C. legislation is clear:

> [B]y enacting D.C.Code § 23–112 (1981), Congress intended that consecutive sentences be imposed for all offenses which are not the same offense under the test established in *Blockburger v. United*

---

7. The Double Jeopardy Clause has been most commonly applied to prevent courts from imposing *consecutive* sentences for the same offense. *Whalen v. United States*, 445 U.S. 684, 689, 100 S.Ct. 1432, 1436, 63 L.Ed.2d 715 (1980). However, the Supreme Court and this court have recently held that the Double Jeopardy Clause applies equally to *concurrent* sentences for the same act under two separate criminal provisions because of the adverse collateral consequences that may arise. *See Ball v. United States*, 470 U.S. 856, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985); *Robinson v. United States*, 501 A.2d 1273, 1274 n. 2 (D.C.1985).

8. D.C.Code § 23–112 provides:

    A sentence imposed on a person for conviction of an offense shall, unless the court imposing such sentence expressly provides otherwise, run consecutively to any other sentence imposed on such person for conviction of an offense, whether or not the offense (1) arises out of another transaction, or (2) arises out of the same transaction and requires proof of a fact which the other does not.

---

trial court erred in stating that self defense is not a defense to malicious disfigurement, we hold, upon reviewing the instructions as a whole, that plain error was not committed here, since the jury was fully instructed on self defense, although not specifically as applied to malicious disfigurement. In addition, the judge's instruction on malicious disfigurement included a definition of malice as willfully committing a wrongful act "without adequate provocation, without justification or excuse." The trial court's charge, when examined in its entirety, contained all the fundamental and necessary instructions. *See Carter v. United States*, 475 A.2d 1118, 1125 (D.C.1984), *cert. denied,* 469 U.S. 1226, 105 S.Ct. 1222, 84 L.Ed.2d 362 (1985); *Dozier v. United States*, 127 U.S.App.D.C. 266, 268 n. 1, 382 F.2d 482, 484 n. 1 (1967).

Secondly, appellant maintains that the court abused its discretion in refusing to repeat the self defense instruction when the jury requested reinstruction on malicious disfigurement. In light of our holding in *Davis v. United States*, 510 A.2d 1051, 1052–53 (D.C.1986), we are precluded from finding an abuse of discretion as the jury *specifically only* asked for reinstruction on the five factors that determine malicious disfigurement.

*States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), unless the sentencing court expressly states otherwise.

*Id.* at 1095 (footnote omitted); *accord Taylor v. United States*, 508 A.2d 99 (D.C. 1986). The question is thus whether the two offenses of which appellant was convicted constitute the same offense within the meaning of *Blockburger.*

 The offenses of assault with intent to kill and malicious disfigurement are governed by separate statutes. A comparison of the essential elements of each offense [9] leaves us with no doubt that each statutory provision requires proof of an element which the other does not. Moreover, our review of the respective statutes compels the determination that Congress intended to create separate and distinct offenses. This intent is evinced by the fact that the two provisions protect separate and distinct societal interests, *Bridgeford v. United States*, 411 A.2d 633, 635 (D.C. 1980), and each offense subjects the offender to different penalties.[10] *See Jones v. United States*, 516 A.2d 929, 934 (D.C. 1987); *Robinson v. United States, supra,* 501 A.2d at 1276. Accordingly, we conclude that the imposition of two separate

9. The essential elements of the offense of assault with intent to kill are that appellant assaulted Cooper with the specific intent to kill him. *See Logan v. United States*, 483 A.2d 664, 670–72 (D.C.1984). Whereas, the essential elements of malicious disfigurement are that appellant inflicted an injury on Cooper which resulted in his permanent disfigurement and that appellant acted both with malice and with the specific intent to disfigure Cooper. *Perkins v. United States*, 446 A.2d 19, 26 (D.C.1982). In this jurisdiction malice is not the equivalent of intent to kill. *Logan v. United States, supra,* 483 A.2d at 671.

10. Assault with intent to kill, D.C.Code § 22–501, provides for imprisonment of not less than two, nor more than fifteen years. The prohibition against malicious disfigurement, D.C.Code § 22–506, carries a punishment of imprisonment of not more than ten years.

11. Appellant's reliance upon dictum in *Owens v. United States, supra,* 497 A.2d at 1086, to support his contention that *Blockburger* has been rejected by this court is misplaced. In *Owens* we affirmed appellant's conviction of assault

and concurrent sentences is not barred by the Double Jeopardy Clause.[11]

*Affirmed.*

with intent to commit robbery while armed and of assault with a dangerous weapon based on two acts which we held to constitute separate criminal incidents rather than one continuing course of conduct. In dictum, we said that where an assault is committed in order to complete a robbery, as distinguished from an assault following a completed robbery, it is usually not treated as a separate offense, but rather as an aggravating factor to be considered in sentencing. *Id.* at 1096.

Our conclusion today is bolstered by our recent resolution of *Taylor v. United States, supra,* 508 A.2d at 99, in which we distinguished *Owens* and *Leftwitch v. United States*, 460 A.2d 993 (D.C.1983) (upon which appellant also relies) and reaffirmed *Blockburger*. In *Taylor*, we found assault with intent to kill and armed robbery constituted separate offenses even if the assault was committed solely to complete the robbery, as each offense required proof of an element not necessary for the other. In this case, as in *Taylor*, but unlike *Owens*, one of the two convictions is not a lesser-included offense of the other. Thus, as in *Taylor*, "the nature of appellant's acts, not their timing, is dispositive." *Id.*