Anthony D. GARDNER, Willie J. Walker, and Michael A. Thomas, Appellants,

v.

UNITED STATES, Appellee.

Nos. 93–CF–654, 93–CF–1312 and 93–CF–1357.

District of Columbia Court of Appeals.

Argued March 5, 1996.
Decided May 29, 1997.

Michael L. Spekter, Washington, DC, appointed by the court, for appellant Gardner.

Mark J. Rochon, Washington, DC, for appellant Walker.

Deborah L. Harris, Public Defender Service, with whom James Klein and David Reiser, Public Defender Service, Washington, DC, were on the brief, for appellant Thomas.

Lisa A. Hertzer, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Roy W. McLeese, III, and Patricia Stewart, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, SCHWELB, and FARRELL, Associate Judges.

TERRY, Associate Judge:

The three appellants appeal from their various convictions resulting from a gang rape of a young woman. After a jury trial, appellants Gardner and Walker were convicted of three counts of rape,[1] one count of sodomy,[2] and one count of assault with intent to commit sodomy.[3] Appellant Thomas was convicted of two counts of rape and one count of sodomy.[4] On appeal, all three appellants present two arguments: (1) that the trial

---

1. D.C.Code § 22–2801 (1989) (repealed 1995).

2. D.C.Code § 22–3502 (1996).

3. D.C.Code §§ 22–503 and 22–3502 (1996).

4. At the close of the government's case, the trial court granted Gardner's motion for judgment of acquittal on one count of sodomy, and granted Thomas' motion for judgment of acquittal on one count of rape.

court committed reversible error when it restricted defense counsel's cross-examination of the victim, and (2) that the court erred when it permitted the prosecutor, over objection, to make certain statements during her closing argument which, they maintain, raised an issue about the victim's chastity. Thomas contends in addition that his two rape convictions should merge because rape is an offense that arises out of a continuous course of conduct. We reject all of these arguments and affirm the convictions of all three appellants.

## I

### A. *The Government's Evidence*

At about 11:00 p.m. on July 10, 1991, a young woman whom we shall call Jane Smith (not her real name) was raped and forcibly sodomized by appellants Gardner, Walker, and Thomas in an alley in the 200 block of V Street, Northwest. A few minutes earlier, Ms. Smith had left her home[5] with her friends Catrice Prailow, Deirdre Jones, and Thomasina Thompson, intending to walk Ms. Thompson home and then take a bus to Ms. Prailow's house in Southeast Washington. As they approached a fast food restaurant on Georgia Avenue, Ms. Smith and her friends saw a blue Rodeo four-by-four truck drive past them. Ms. Smith did not see who was in the truck, but Ms. Thompson said to Ms. Jones, "There goes your boy friend."

The four women continued walking and eventually arrived in the 200 block of V Street. There they saw the same blue Rodeo truck, from which a group of men emerged, including the three appellants. The women walked in the direction of the truck and stopped at a fenced-in courtyard area. There Deirdre Jones spoke with her boy friend, appellant Thomas, while Thomasina Thompson talked with appellant Gardner,

and Catrice Prailow spoke to two other men whom Ms. Smith did not know.[6]

As Ms. Smith stood alone next to the fence, appellant Walker approached and began feeling her buttocks and legs. She immediately told him to stop and pushed his hands away. Walker then started "humping up against [her]" while holding onto the fence, but once again she pushed him away. In the meantime, Walker's companions taunted Ms. Smith by saying, "Ah, look at her, look at her, look at her." Walker said to Ms. Smith, "Don't play with me," and struck her in the face. He then began to choke Ms. Smith from behind by putting his arm around her neck with his elbow at her throat. The other men continued their taunts, saying such things as "Put her in the car" and "Make her walk, she's going to walk." Walker said he was "going to put her to sleep," to which Gardner replied, "I'm going to wake her up."

Greatly frightened, Ms. Smith gripped the fence behind her so that Walker could not pull her away. As the taunting continued, however, Walker began to choke her harder until eventually she had difficulty breathing. She looked toward Ms. Thompson and asked for help, but Thompson replied that there was nothing she could do "because she didn't know him." Ms. Smith then tried to yell to Deirdre Jones, but by then Walker was choking her so hard that she could not speak. Thinking that Walker was only trying to "show off" in front of his friends and that he would let her go once they were away from the crowd, Ms. Smith agreed to go with him up V Street toward Florida Avenue. Walker continued to choke her as they walked, but eventually he put his arms around Ms. Smith as if he were "hugging" her.

As they approached Florida Avenue, Walker suddenly pulled Ms. Smith down a walkway between two buildings where her friends could not see her.[7] He released Ms. Smith

---

5. Ms. Smith lived with her mother, her one-year-old daughter (the child of her boy friend "Pee Wee"), her sister, a niece, and a nephew.

6. Ms. Smith had met Thomas a few times when *he* was dating one of her friends. She also knew Walker by his nickname, "Wee Wee."

7. Diane Brown lived in a third-floor apartment at 255 V Street, Northwest. She testified that on the evening of July 10 she looked out her window shortly after 11:00 p.m. and saw appellant Walker (whom she had known for several years) coming through the passageway beside her building with a woman whom he was "hugging around the neck." As the pair came closer, Ms.

in the walkway, but grabbed her again around the neck when they reached the alley behind the two buildings. By then Ms. Smith was crying. She kept asking Walker "why he was doing this," but he "just kept telling [her] to shut up." Ms. Smith then asked, "What are you going to do to me?", to which Walker replied (in crude terms) that he was going to have sex with her. Ms. Smith turned around to see where she was, and at that moment appellant Gardner walked into the alley. When Walker asked Gardner why he had come, Gardner began to unfasten his pants and said, "You know what I want, you know what I want."

Walker then told Ms. Smith to take off her clothes. She pleaded with the two men not to "do this to [her]," but Walker pulled her jeans open. By this time, a group of about ten young men had gathered around Ms. Smith in the alley and told her to pull her pants down. She complied with their demands because she was afraid of what might happen to her if she refused.

We need not describe in detail the events that followed, other than to say that Ms. Smith was subjected to a series of sexual indignities by all three appellants, including rape, attempted rape, and oral sodomy. At one point Thomas said to someone, "Go get the jaunt," which Ms. Smith believed was a gun. Moments later, while she was being held by Gardner, Ms. Smith caught a glimpse of her girl friends sitting on a bench just outside the alley. Finally, the assaults stopped when two other men walked into the alley, and the group of onlookers scattered. As Ms. Smith pulled up her pants, Thomas stood in front of her and told her, "If you tell the police, they are going to kill you." Ms. Smith replied that she just wanted to go home to her daughter. Thomas told her to stop crying, wiped away her tears, and then stepped aside.

Ms. Smith walked out of the alley and saw her girl friends still seated on the bench. She went past them without saying a word and headed down V Street in the direction of her home. Ms. Prailow and Ms. Jones followed after her, but Ms. Smith told them she was going home.[8] She then said to Ms. Jones, "Deirdre, why did they do that to me?" Ms. Prailow asked, "What did they do to you?", and Ms. Smith replied, "They raped me." Ms. Smith then said to Ms. Jones, "He's supposed to be your boy friend. Why did he [rape] me?"

Ms. Smith proceeded to a bus stop on Florida Avenue. On her way she saw a police officer, but she did not stop to speak with him because she was afraid and because Thomas had threatened her. Ms. Smith took a bus home and told her sister she had been raped. Her sister immediately called the police.[9]

Officer Sheila Kelly and her partner responded to Ms. Smith's home at about 1:00 a.m. after receiving a radio run concerning the rape. Officer Kelly testified that Ms. Smith was very upset, pacing back and forth and crying, and that she shoved everyone out of her bedroom and said she could not talk to the police because "they're going to kill me." When Officer Kelly finally managed to speak with her alone, Ms. Smith said she had been raped and named Walker and Thomas by their nicknames ("Wee Wee and Mike") as two of the "three or four" perpetrators. She also gave descriptions of three of the men who raped her.

Officer Kelly contacted the police department's Sex Squad to report what she had learned and then took Ms. Smith back to the crime scene, where she was interviewed by Detective Keith Reid. Ms. Smith told Detective Reid that Thomas had raped her twice and that the order in which the first three rapes had occurred was Gardner first, Thom-

---

Brown heard Walker say, "Come on." The woman replied, "No, I don't want to go," and Walker again said, "Come on." Ms. Brown then lost sight of them.

8. Just at that moment, gunshots unrelated to the rape rang out in the neighborhood, causing Ms. Prailow and Ms. Jones to run. Ms. Smith testified that she was too frightened to run, but her friends waited for her across the street. By the time she caught up with Prailow and Jones, Ms. Smith was crying.

9. Ms. Smith admitted on cross-examination that she had initially told defense investigators that she herself had called the police when she returned home.

as second, and Walker third.[10] The three appellants were later identified by Ms. Smith at three separate lineups on July 23 (Walker), August 27 (Gardner), and October 9 (Thomas).

In the early morning hours of July 11, Dr. Rodney Hill examined Ms. Smith at Howard University Hospital.[11] Dr. Hill testified that he did not observe anything unusual in his examination. He added, however, that when a woman has been subjected to sexual intercourse against her will, observable signs of trauma such as bruising, bleeding, or tearing will not always be found, especially when the woman is of reproductive age and has already borne a child, as Ms. Smith had. Dr. Hill also testified that Ms. Smith had told him that eight to ten men had attacked her and that they wore condoms. Ms. Smith did not recall making this statement to the doctor, but she did remember telling him that she had heard a conversation about condoms.

Finally, the government called Officer Alfred Holmes, an evidence technician who collected evidence from the alley where Ms. Smith had been raped. He testified that two used condoms,[12] a pair of black sneakers,[13] and a pair of white sweat socks were recovered from the alley in the early morning hours of July 11.

### B. *The Defense Evidence*

Appellants' theory of defense was that Ms. Smith had engaged in consensual, casual sex to retaliate against her boy friend, Pee Wee, whom she suspected of being unfaithful. Chagrined by her actions, she then embellished her account of what had happened because she believed her girl friends were skeptical of what she told them.

To support this theory, appellant Thomas called Thomasina Thompson as a witness.[14] She testified that on the evening of July 10 she and the other three women had left Ms. Smith's house, stopped at a fast food restaurant for something to eat, and then walked down V Street, where they saw the three appellants. Ms. Thompson went over and hugged Gardner, who then started talking to her and Ms. Smith as they all stood next to a fence. Ms. Jones was in the street talking to Thomas and Walker, and Ms. Prailow was speaking to another man whose nickname was "Slope." Jones, Thomas, and Walker then walked over to the fence, and Walker began talking to Ms. Smith. Thompson recalled that Ms. Smith began crying briefly, then walked away with Walker.[15] After they

---

**10.** Walker asserts that Detective Reid testified that Ms. Smith changed her story several times. Reid acknowledged that he had failed to note on the police Form PD–251 that Gardner had engaged in intercourse with Ms. Smith. He explained, however, that this omission was merely a clerical error on his part, and that Ms. Smith did in fact report that three individuals had raped her. Detective Reid also admitted that the Form PD–123 and the affidavit in support of an arrest warrant, which he also prepared, said that Walker was the first person to engage in intercourse with Ms. Smith, and that Gardner was third. Again, the detective explained that this was an error on his part, and that Ms. Smith had originally reported that Gardner was the first to rape her.

**11.** The government entered into a stipulation with appellant Gardner as follows: "That vaginal swabs were obtained from [Jane Smith] during examination at Howard University Hospital on July 11, 1991, and that those swabs were analyzed by the FBI. A scientific analysis established that the semen on the swab was that of Anthony Gardner."

**12.** All three appellants entered into the following stipulation with the government: "If called to testify in this case, FBI Special Agent Robert

Crispino would testify that he performed scientific tests on the two condoms recovered by the police in this case and that no semen was detected in the condoms."

**13.** Detective Reid said these were the sneakers that Gardner claimed to have worn that night. Gardner testified that he had consensual sex with Ms. Smith for money; he also said he had removed his shoes and socks in the alley.

**14.** Ms. Thompson recalled hearing Ms. Smith say that evening that she was angry at her boy friend.

**15.** Although Thompson testified on direct examination that she did not believe anything was wrong when Ms. Smith left with Walker, she admitted on cross-examination that she had seen Walker trying to get close to Ms. Smith and that Smith had pushed him away. She also acknowledged that she heard two slaps and that Walker had his arm around Ms. Smith's neck while Smith was saying, "Get him off of me." Thompson said that she had tried to help Ms. Smith by telling Walker "to get off of her" and by soliciting the help of Gardner, but Gardner said, "She'll be all right." Ms. Smith then started crying before she and Walker left.

left, Ms. Thompson went up some steps and sat on a bench with Gardner, Thomas, Ms. Jones, Ms. Prailow, and Slope.

Gardner and Thomas soon left the bench and walked back toward the alley.[16] After a short time, Thomas returned to the bench for a while, then left the bench again when Thompson and Jones told him to go and see what was wrong with Ms. Smith.[17] Before returning to the alley, however, Thomas told the women that Ms. Smith was "all right." Ms. Thompson did not see Thomas again that evening.

Then two other men came along, and an argument started in the alley. When Ms. Smith later reappeared, she was not "like herself." She walked past the bench where Ms. Thompson was seated, but Thompson did not see her crying; she admitted on cross-examination, however, that she was not looking directly at Ms. Smith because she was speaking to Gardner. Ms. Smith then left with Ms. Jones and Ms. Prailow.

Roy Conn, an attorney who had previously represented Thomas in this case, was called by Walker as a witness. Mr. Conn testified that he had spoken to Thomasina Thompson about two months after the incident. According to Conn, Ms. Thompson had told him that Ms. Smith said she "ought to slash [her boy friend's] tires because they had gotten into an argument."[18] Conn also said that Thompson had told him that Thomas left the bench twice, each time for about a minute.[19]

## II

All three appellants argue that the trial court committed error when it prohibited defense counsel from cross-examining Ms. Smith about whether she thought her friends believed her accusation of rape. This line of questioning, appellants maintain, was essential to show that Ms. Smith had a motive to alter her account of what happened. That motive, in turn, was the underpinning of their defense theory—that Ms. Smith had engaged in consensual sex to retaliate against her boy friend and that, embarrassed by her actions, she later fabricated the rape charge and exaggerated her account of the events in order to persuade her skeptical friends. The government maintains that the trial court did not "preclude" a line of cross-examination designed to show bias, but "merely regulated the form of questions that defense counsel could pose to establish Ms. Smith's purported motive to embellish." We agree with the government and find no error in the trial court's actions.

### A. Factual Background

During the cross-examination of Ms. Smith by counsel for Thomas, the following exchange took place:

Q. Now, you told us just a minute ago and several times before that when you left the alley, you were crying, correct?

A. Yes.

Q. But didn't you also tell Mr. Grimm [counsel for Gardner] just a few minutes ago that when you came out of the alley, it appeared to you that your girl friends didn't believe that you had been raped?

A. Did I tell him that?

Q. Didn't you just tell him that?

Ms. STEWART [the prosecutor]: Objection, Your Honor. That's not my recollection of the answer.

Q. I will—

THE COURT: Rephrase it.

Q. Remember when Mr. Grimm asked you a lot of questions about did your girl friends offer to help you when you told them, remember that?

A. Yes.

---

16. When Thompson saw Gardner again that evening, he was barefoot.

17. Ms. Thompson did not know how long Thomas was gone the first time or how long he remained at the bench before leaving again. She also testified that she could not hear or see anything that was happening in the alley.

18. Ms. Thompson had testified that she did not remember speaking to Mr. Conn, or telling him that Ms. Smith said she was so upset with her boy friend that she should slash his tires. Mr. Conn's hearsay testimony was admitted solely to impeach Ms. Thompson on these points.

19. On cross-examination, Conn conceded that Ms. Thompson also told him she was not wearing a watch.

Q. Did your girl friends offer to go to the police when you told them?

A. Right.

Q. And the reason that they didn't was because you were so calm when you left the alley that they didn't appear to believe you, did they?

A. I don't know if they believed—

MS. STEWART: Objection.

THE COURT: Sustained. Hold it.

At a bench conference, counsel for Thomas said, "I'm not asking what they thought. I'm asking whether she thought they believed her." The court asked, "But based on what is she supposed to conclude they didn't believe her?" Counsel replied that certain facts had already been established during the cross-examination of Ms. Smith, *e.g.*, that her friends did not call the police or otherwise help her.[20] The court then announced its ruling in the following exchange:

MS. STEWART: Your Honor, I think counsel [for Thomas] has elicited enough facts that he can argue his position [without asking] did she think they believed her or not believe her. He's asking her about what they concluded. I think he can ask what they did, what they didn't do, but I would object to her speculating what was in their minds.

MR. LEVY [counsel for Thomas]: That wasn't what I was asking her. I was asking her what she felt. And I would point out to the Court [that Ms. Thompson] gave a statement saying she didn't believe her. I mean that's another factual predicate. But that doesn't come out until, obviously, [Ms. Thompson] comes in.

---

**20.** The trial court had allowed unrestricted cross-examination of Ms. Smith about her friends' observable reactions to her charge of rape. For example, counsel for Gardner pursued the following line of cross-examination:

Q. Now, you told them generally what happened?
A. Yes.
Q. Now, one or both of them or some of them didn't believe you, did they?
MS. STEWART: Objection.
THE COURT: Sustained. You may rephrase.
Q. Well, did they suggest to go to the hospital or call the police?
A. No.
Q. They didn't say that?

THE COURT: Well, I'm going to hold ... I'm going to stand by my ruling in sustaining the objection. That does not foreclose you from asking further questions in terms of ... any facial expression on her friends, any body movements towards her, away from her, anything that is objective that she saw, that doesn't call for this witness to speculate or conclude or assume what was going on in someone else's mind. I understand your proffer.

### B. *Constitutional Concerns and the Confrontation Clause*

■ The Sixth Amendment grants an accused the right to confront and cross-examine the government's witnesses against him. *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); *Davis v. Alaska*, 415 U.S. 308, 315–316, 94 S.Ct. 1105, 1109–10, 39 L.Ed.2d 347 (1974); *Elliott v. United States*, 633 A.2d 27, 31 (D.C.1993); *Jenkins v. United States*, 617 A.2d 529, 531 (D.C.1992). "An important function of this constitutionally protected right is the exposure of the witness' biases or motives for not telling the truth." *Elliott*, 633 A.2d at 32; *see Van Arsdall*, 475 U.S. at 678, 106 S.Ct. at 1434; *Jenkins*, 617 A.2d at 531. Bias, therefore, is "always a proper subject of cross-examination," which takes on "enhanced significance where the credibility of the key government witness is in issue." *Jenkins*, 617 A.2d at 531 (citations omitted).[21] Thus the Supreme Court has held:

[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination

---

A. No.
Q. Did they say do you want us to help you or go see a doctor, or anything like that?
A. I don't remember them saying anything like that.
Q. They just left you, right?
A. Yes.
Q. And you went home alone?
A. Yes.

**21.** Although appellants do not assert that Ms. Smith was personally biased for or against a party, a "motive to lie" clearly falls within the definition of bias. *See Ford v. United States*, 549 A.2d 1124, 1125 n. 2 (D.C.1988) (citing cases).

designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness."

*Van Arsdall, supra,* 475 U.S. at 680, 106 S.Ct. at 1435–36 (quoting *Davis v. Alaska, supra,* 415 U.S. at 318, 94 S.Ct. at 1111).

■ But the right to cross-examine is not absolute. *Van Arsdall,* 475 U.S. at 679, 106 S.Ct. at 1435; *Jenkins,* 617 A.2d at 532; *Roundtree v. United States,* 581 A.2d 315, 320–321 (D.C.1990). As the Court made clear in *Van Arsdall:*

> [T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.... "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."

*Id.* at 679, 106 S.Ct. at 1435 (quoting *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 294–95, 88 L.Ed.2d 15 (1985) (emphasis in original)).[22] This court has "likewise recognized the discretionary role of the trial court in controlling bias cross-examination," *Ford, supra* note 21, 549 A.2d at 1127, and has observed that "the probative value of impeachment does not vest an examining attorney with an unbridled license." *Jenkins,*

617 A.2d at 532; *accord, e.g., Washington v. United States,* 499 A.2d 95, 101 (D.C.1985).

■ Guided by these principles, we must first determine whether the cross-examination permitted here by the trial court was sufficient to comport with the requirements of the Sixth Amendment. *Jenkins,* 617 A.2d at 532. Constitutional error will be found only when "the trial court's rulings prohibited *all* inquiry into the possibility of bias under [the] defendant's theory." *Ford,* 549 A.2d at 1126 (emphasis in original); *see Van Arsdall,* 475 U.S. at 678–679, 106 S.Ct. at 1434–35; *Davis,* 415 U.S. at 318, 94 S.Ct. at 1111.

Appellants assert that the trial court committed constitutional error when it "precluded [Thomas' counsel] from cross-examining the complainant to show that she fabricated her lack of consent and exaggerated her claims because she felt her friends did not believe her." They concede, however, that the court "allowed [them] to ask on several occasions whether or not the complainant was indeed exaggerating her story." The record clearly shows that the defense put before the jury its theory that Ms. Smith had embellished her account of what happened in the alley.[23] Defense counsel explicitly cross-examined her on whether she was "exaggerating" and "making the story a little bit better," accusations which she flatly denied.

■ Despite their concession, appellants claim that this direct line of questioning was inadequate because it prohibited them from exploring *why* Ms. Smith was "exaggerating." *See Davis v. Alaska, supra,* 415 U.S. at 318, 94 S.Ct. at 1111 ("[w]hile counsel was

**22.** *Accord, e.g., Elliott, supra,* 633 A.2d at 32; *Jenkins, supra,* 617 A.2d at 532; *Scull v. United States,* 564 A.2d 1161, 1164 (D.C.1989); *Ford v. United States, supra* note 21, 549 A.2d at 1124.

**23.** Moreover, counsel for Thomas confronted Ms. Smith with allegations that her friends had disbelieved her original tale of rape:

> Q.... [Y]ou told your friends that four people raped you at first, didn't you?
> A. No, I didn't.
> Q. Well, you told them that one of the four was a guy named Slope Head, didn't you?
> Q. No, I didn't.
> Q. Well, are you sure that Catrice [Prailow] didn't say to you Slope Head didn't do any-

> thing because he was with me? You don't remember her saying that?
> A. No, I don't.

> \* \* \* \* \* \*

> Q. Now, Ms. Prailow not only told you that Slope Head hadn't been with you, but she also told you that [Thomas] had been with her and Deirdre [Jones] the whole time, didn't she?
> A. I don't remember her telling me that he was with them the whole time.

> \* \* \* \* \* \*

> Q. She said he was out here on the bench with us, didn't she? Ms. Prailow said that right after your told her this?
> A. She told, she told me he came out there, but he was back there.

permitted to ask [the witness] *whether* he was biased, counsel was unable to make a record from which to argue *why* [the witness] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial" (emphasis in original)); *Jenkins, supra,* 617 A.2d at 533; *Ford, supra* note 21, 549 A.2d at 1126 n. 7. They rely heavily on *Keene v. United States,* 661 A.2d 1073 (D.C.1995), in which we held that it was error to exclude evidence of the victim's prior sexual acts with someone other than the defendant when the excluded evidence "demonstrated the existence of a powerful motive to fabricate a charge of sexual abuse." *Id.* at 1079. Appellants contend that by precluding questions about Ms. Smith's perceptions of her friends' skepticism, the trial court was, in effect, excluding evidence that established her bias and motive to fabricate. We cannot agree.

The cross-examination of Ms. Smith allowed the jury to hear that she told her girl friends she was raped and that, after hearing this allegation, they did not offer to help her or suggest that she call the police or go to the hospital. These facts were sufficient to enable defense counsel to argue to the jury that Smith perceived skepticism from her friends. Moreover, the court's regulation of the form of questioning in no way prohibited defense counsel from asking why Ms. Smith might have been biased. In fact, by questioning her about whether she was mad at her boy friend, defense counsel had already put before the jury a possible motive for the allegedly fabricated claim of rape. Cases such as *Ford, Jenkins,* and *Van Arsdall* are therefore inapposite because the trial judge in each of those cases completely curtailed a line of questioning which would have enabled the jury to discover the witness' motive for bias. We are satisfied that the questioning permitted in this case satisfied Confrontation Clause requirements.

### C. *Trial Court Discretion*

Having determined that the trial court's regulation of the cross-examination of Ms. Smith did not violate the Confrontation Clause, we must next consider whether the court's ruling was otherwise an abuse of discretion. *See, e.g., Roundtree v. United States, supra,* 581 A.2d at 322–323. In addressing that issue, we "must determine, first, whether the exercise of discretion was in error and, if so, whether the impact of that error requires reversal." *Johnson v. United States,* 398 A.2d 354, 367 (D.C.1979). Reversal is warranted only where an abuse of discretion results in prejudice. *Id.* at 366.

As we have often held, "[t]he extent of cross-examination on an appropriate subject of inquiry is a matter within the sound discretion of the trial court." *Meaders v. United States,* 519 A.2d 1248, 1253 (D.C. 1986). In *Elliott v. United States, supra,* we explained:

> After sufficient cross-examination has been allowed to satisfy constitutional requirements, the trial court retains broad discretion to determine the scope and the extent of cross-examination.... In exercising its discretion, the trial court may restrict cross-examination within reasonable limits to avoid such problems as harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.... The court may also exercise its discretion to preclude cross-examination where the prejudicial effect of the proffered evidence outweighs its probative value.

633 A.2d at 32 (citations and internal quotation marks omitted). On the other hand, this court has also held:

> [T]he reach of cross-examination is delimited by the scope of direct examination. Therefore, the trial court should permit cross-examination to explore any matters which tend to contradict, modify, or explain testimony given on direct.

*Hart v. United States,* 538 A.2d 1146, 1148 (D.C.1988); *see also Butler v. United States,* 646 A.2d 331, 339 n. 8 (D.C.1994), *cert. denied,* 514 U.S. 1009, 115 S.Ct. 1326, 131 L.Ed.2d 206 (1995).

On the present record, we can find no abuse of discretion. Defense counsel's questions, though relevant, were posed in a manner that required Ms. Smith to speculate on the state of mind of her friends. The trial judge imposed certain restrictions in order to forestall such speculation. Appellants con-

tend that they sought only to elicit how the apparent skepticism of her friends affected Ms. Smith's state of mind, but the judge correctly recognized the potential confusion of opinion with state of mind in this line of questioning. Moreover, since defense counsel had already elicited substantial testimony from Ms. Smith about her friends' skepticism, additional questions were cumulative and therefore properly subject to limitation. *See Scull, supra* note 22, 564 A.2d at 1164. The judge's ruling did not completely curtail defense counsel's line of questioning, but merely regulated the manner in which the questions were asked. The jury was still able to consider the inference of suspicion that the defense sought to raise. Because the trial court gave the defense considerable leeway to explore Ms. Smith's bias and challenge her credibility, we find no basis for reversal.

### III

Before trial, the government filed a motion *in limine* to exclude evidence of unrelated sexual conduct by Ms. Smith pursuant to *McLean v. United States,* 377 A.2d 74 (D.C. 1977), and its progeny.[24] No written opposition to that motion was filed by any of the appellants. In *McLean* this court held that prior sexual acts of a rape victim with someone other than the defendant are presumptively inadmissible to attack the victim's credibility or chastity, or to show consent on a particular occasion. *Id.* at 77–80; *see Brewer v. United States,* 559 A.2d 317, 320 (D.C.1989) ("The time is long past when a defendant charged with rape could put his victim on trial"). The trial court ruled in this case that defense counsel must consult with the court before cross-examining in an area that implicated *McLean.*

Having thus been foreclosed during trial from introducing evidence of Ms. Smith's prior sexual behavior, appellants now contend that the prosecutor's closing argument "opened the door" to such evidence. The prosecutor's comments, according to appellants, allowed the jury to infer that Ms. Smith had an ongoing, monogamous relationship with her boy friend Pee Wee, and that Smith was a chaste woman who would not jeopardize her relationship "with an impulsive act of casual sex." The government, on the other hand, maintains that the prosecutor's argument "was based on fair inferences from the testimony at trial, was proper rebuttal of the defense theory of the case, and, as the trial court found, 'was not a reference to chastity on the part of Ms. [Smith].'"

### A. What the Prosecutor Said

In her closing argument, the prosecutor challenged defense counsel's theories about why Ms. Smith would have a motive to fabricate a charge of rape. The prosecutor summarized one of those theories as follows:

They said she's angry with her boy friend. She's very, very angry with her boy friend because another woman came over and looked at the truck. So she went back in the alley with someone she doesn't know, went back there between those filthy dumpsters, had sex with him and then was embarrassed about it, so she made up a rape charge to make it look better. That's her motive.

The prosecutor questioned whether this defense theory made any sense, and then added:

The last thing she said to you on the witness stand. I asked her, "Were you mad at your boy friend Pee Wee?" She said yes. I said, "Were you so mad that you would go out and have—that you went out and had sex with Anthony Gardner?" or words to that effect. She said, "Why would I have sex with someone I don't even know in an alley by trash cans?"[25]

---

**24.** Ms. Smith apparently had a reputation for promiscuity. There was also a possibility that a pregnancy which resulted in an abortion a month before she was raped had been the result of a sexual relationship with a man other than her boy friend.

**25.** Ms. Smith had in fact so testified:

Q. Were you angry enough that you would go out and have sex with a man you never saw before?
A. No. No, I wasn't. Why would I do that with someone I don't even know, don't even know them? I may have seen them before, I do not know them. Why would I want to have

There is no reason. There is no reason that makes any sense, not payback for money or getting somebody mad at you.

*This was her boy friend. They had a baby that was a year old, so they had been together for a while. You don't have a fight with your boy friend and go out and do something like this and then go through all of this afterwards.* But you can decide, and you are the ones who have to decide. whether she had any motive to lie. [Emphasis added.]

At the conclusion of the prosecutor's argument, defense counsel objected:

> MR. ROCHON [counsel for Walker]: ... [W]hile Ms. Stewart has successfully objected to any reference to the prior sexual conduct of the complaining witness during this trial on the grounds it would be unfair to the government, she has now, in her closing, developed a few suggestions [that Ms. Smith] had a long-term, close, intimate relationship with this boy friend of hers, the father of her child, and that therefore she would not ... go out and have sex with someone she didn't know.
>
> Well, this is evidence of chastity or its next best thing.... It is unfair to the defense for her [the prosecutor] to put in evidence of chastity. I have evidence of lack of chastity that I could have put in from other witnesses, including Thomasina Thompson.

After Thomas' counsel joined in the objection, the prosecutor responded:

> ... My statement, I believe, was in talking about the defense theory that she was so angry with her boy friend that she would go out and do this. Indeed, I asked her, without objection, if she was angry and if she was so angry with him that she would do that. She said, "Why would I?", et cetera, et cetera.
>
> I think the thrust of my argument was clear that this relationship—which had lasted at least a year because [there] was evidence at trial they had a baby, and counsel elicited he was the father of the baby—was one that, just because she had an argument with him, she wasn't going to sex with somebody in an alley between trash

go out and have sex in a trash can. That's a fair reading of that. I did not introduce chastity. I didn't say a word about it. It was in the context of the defense theory that she did this to get revenge or get back at him because she was angry and jealous.

The court denied defense counsel's requests to reopen their case and to instruct the jury about the restrictions of *McLean:*

> I am not going to grant the motion to reopen. I think that if you consider the totality of the argument, the mention that was made by Ms. Stewart was not a reference to chastity on the part of Ms. [Smith], but was a direct comment on the state of the evidence. I think it was a fair argument.

Defense counsel revisited the issue the next day, and the court restated its ruling:

> ... [A]s I said yesterday, the way I construed the argument made by Ms. Stewart, it was a rebuttal to comments made by defense counsel as to why she would have a motive to basically yell rape, given the situation with her boy friend as of that night. I did not take the comment, in the context of the entire argument here, two hours' worth of arguments yesterday—actually more than that, almost two and a half hours of arguments ... to rise to the level of being a comment on whether Ms. [Smith] was chaste or not chaste, and therefore did not open the door, in my view, to the type of evidence which I accept your proffer that you were prepared to present yesterday.

### B. *Was There Error?*

 In evaluating the prosecutor's comment about Ms. Smith's relationship with her boy friend, we follow a well established two-step procedure. First, we must determine whether the comment was improper. If we conclude that it was, we must nevertheless affirm the conviction unless we conclude that the defense suffered "substantial prejudice" as a result of the impropriety. *See, e.g., McGrier v. United States,* 597 A.2d 36, 41 (D.C.1991) (citing cases). Whether there has been substantial prejudice depends on

cans?

"the gravity of the misconduct, its relationship to the issue of guilt, the effect of any corrective action by the trial judge, and the strength of the government's case." *Dixon v. United States,* 565 A.2d 72, 75 (D.C.1989) (citation omitted).[26] Applying these principles, we hold that the prosecutor's remark that Ms. Smith would not have had consensual sex with three other men in an alley was not improper, and thus we need not even consider whether it was substantially prejudicial to the defense.

 "The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence." *Dixon, supra,* 565 A.2d at 77 (citation and internal quotation marks omitted). Of course, a prosecutor (or a defense attorney) may not go beyond reasonable inference and engage in impermissible speculation. *See Mills v. United States,* 599 A.2d 775, 785 (D.C.1991). Deciding whether a comment made by counsel is a "reasonable inference" or "impermissible speculation," however, is usually a task best suited to the trial judge, who is "on the spot" and has "a vantage point superior to ours." *Id.* (citations omitted); *see Dixon, supra,* 565 A.2d at 75 ("an appellate court's assessment of the dynamics of a trial is limited to what can be discerned from a cold record"); *Smith v. United States,* 315 A.2d 163, 167 (D.C.), *cert. denied,* 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974).

 In this case the trial judge concluded that the prosecutor, in saying what she said, was not referring to any assumed or asserted chastity on Ms. Smith's part. We find no error in that assessment. *See Jeffries v. Nix,* 912 F.2d 982, 986 (8th Cir.1990) (testimony about complainant's family life and job at convalescent center did not create inference of chastity), *cert. denied,* 499 U.S. 927,

111 S.Ct. 1327, 113 L.Ed.2d 259 (1991); *Banks v. State,* 185 Ga.App. 851, 853, 366 S.E.2d 228, 230 (1988) (testimony that complainant had been going steady for a year or two did not open the door to inquiry into past sexual conduct); *State v. Jeffries,* 417 N.W.2d 237, 240 (Iowa App.1987) (testimony that portrayed complainant as a "family person" did not create an inference of chastity that opened the door to evidence of prior sexual behavior). Here the prosecutor simply reminded the jury of the basic fact of Ms. Smith's relationship with Pee Wee, namely, that they had "been together for a while." That reminder did not imply that the relationship was "committed" or "enduring" or "monogamous," as appellants maintain, nor did it suggest anything about Ms. Smith's chastity or unchastity. It was obvious from the fact that Pee Wee was the father of her child that he and Ms. Smith had had some kind of a romantic relationship, but that fact alone did not entitle the defense to open up the issue of Ms. Smith's chastity and explore it in detail before the jury.

Appellants argue nevertheless that the prosecutor's comment was a "calculated end run" around *McLean* that "blindsided" the defense and amounted to "grave misconduct." On the contrary, we find no misconduct whatsoever. In *McLean* we emphasized that "[r]eputation testimony [about unchastity] should not be admitted except in the most unusual cases where the probative value is precisely demonstrated and outweighs the prejudicial effect of the testimony." 377 A.2d at 79 (footnote omitted). Appellants' theory that the prosecutor "opened the door" to such evidence does not make this one of those "most unusual cases," when the prosecutor merely responded in reasonable fashion to the defense suggestion that Ms. Smith had sex with a stranger in an alley to spite her boy friend.[27]

---

26. In this case defense counsel made a timely objection to the prosecutor's comment. Had he not done so, we would review the record under the much more stringent plain error standard, which requires a showing of error "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts v. United States,* 362 A.2d 706, 709 (D.C. 1976) (en banc); *see McGrier, supra,* 597 A.2d at

41, citing *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985).

27. The trial judge also ruled that the prosecutor's comment was "a rebuttal to comments made by defense counsel as to why she would have a motive to basically yell rape, given the situation with her boy friend as of that night." This ruling was also correct and provides additional support for our conclusion that there is no ground for

## IV

Finally, Thomas contends that his two rape convictions punished him twice for the same offense in violation of the Double Jeopardy Clause of the Fifth Amendment.[28] Citing *Gray v. United States*, 544 A.2d 1255 (D.C. 1988), and *In re T.H.B.*, 670 A.2d 895, 900 (D.C.1996), cases in which we held that two assaultive acts constituted only one offense, he argues that one of the rape convictions must be vacated because the offense of rape, by its nature, is one that involves a "continuous course of conduct." The government contends that Thomas committed two separate and distinct acts of rape against Ms. Smith, and that between those acts Ms. Smith was forcibly raped and sodomized by appellant Walker. Because Walker's conduct "was a separate criminal incident committed by a separate criminal actor," the government asserts that it "clearly broke the continuity of the first rape that Thomas committed."

The Double Jeopardy Clause prohibits a second prosecution for a single crime and protects against multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076–77, 23 L.Ed.2d 656 (1969). It does not, however, "prohibit separate and cumulative punishment for separate criminal acts." *Owens v. United States*, 497 A.2d 1086, 1094–1095 (D.C.1985), *cert. denied*, 474 U.S. 1085, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986). It is therefore well established that when there is "an appreciable period of time"[29] between the acts on which two criminal convictions are based, there is no merger, even if the interval is "quite brief."[30] As we explained in *Owens*:

> reversal. *Cf. United States v. Young, supra* note 26, 470 U.S. at 11–14, 105 S.Ct. at 1044–46 (discussing "invited response" doctrine).

**28.** Both Thomas and the government devote significant portions of their briefs to a discussion of the common law of rape and the legislative history of the former rape statute, D.C.Code § 22–2801 (repealed 1995). We see no need to delve into this history in order to decide Thomas' double jeopardy claim.

**29.** *Allen v. United States*, 580 A.2d 653, 659 (D.C. 1990).

If at the scene of the crime the defendant can be said to have realized that he has come to a fork in the road, and nevertheless decides to invade a different interest, then his successive intentions make him subject to cumulative punishment, and he must be treated as accepting that risk, whether he in fact knows of it or not.

*Id.* at 1095 (quoting *Irby v. United States*, 129 U.S.App. D.C. 17, 390 F.2d 432 (1967) (en banc) (Leventhal, J. concurring)). The dispositive issue on appeal, therefore, is whether there was any evidence that Thomas reached a "fork in the road," leading to a "fresh impulse"[31] which resulted in a separate offense.

We have recognized that "[s]ome crimes, by their very nature, tend to be committed in a single continuous episode rather than in a series of individually chargeable acts." *Owens, supra*, 497 A.2d at 1096; *see In re T.H.B., supra*, 670 A.2d at 900; *Gray v. United States, supra*, 544 A.2d at 1258; *Shivers v. United States*, 533 A.2d 258, 261–262 (D.C.1987); *Glymph v. United States*, 490 A.2d 1157, 1160 (D.C.1985). Assault and rape are two such crimes. For example, in *Gray v. United States* we held that the rape in question, like many assaults, was committed in a continuous course of conduct because the assailant never departed from his original intent of having sexual intercourse against the will of the victim. Even though the victim and her attacker moved a short distance and were interrupted between acts of sexual intercourse, there was no significant break, either temporally or spatially, between the rape events. 544 A.2d at 1258–1259. We also noted in *Gray* that courts in other jurisdictions have found only a single crime in similar situations.[32] In different

**30.** *Spain v. United States*, 665 A.2d 658, 661 (D.C.1995).

**31.** *See Blockburger v. United States*, 284 U.S. 299, 302–303, 52 S.Ct. 180, 181–82, 76 L.Ed. 306 (1932).

**32.** *See, e.g., People v. Mota*, 115 Cal.App.3d 227, 171 Cal.Rptr. 212 (1981) (repeated acts of intercourse during a one-hour gang rape were part of a single continuous offense); *Williams v. State*, 721 P.2d 1318 (Okla.Crim.App.1986) (single rape conviction upheld for two acts of penetration);

factual settings, however, this court, applying the "fork in the road" test, has held that there were two offenses rather than one. The factors generally considered in such cases include the passage of time, a change of location, and any evidence that the defendant may have reformulated his intent. *See Owens,* 497 A.2d at 1096–1097.

In this case the evidence showed that "an appreciable period of time" elapsed between the separate incidents of rape, that intervening events occurred, and that Thomas reformulated his criminal intent. When he first appeared in the alley, Thomas' initial impulse was to have Ms. Smith perform oral sex upon him. His second impulse was to have intercourse with her. Having attained both of these objectives, Thomas then left the alley and sat on a bench for a few minutes with Thomasina Thompson.[33] Had Thomas not gone back into the alley, his criminal liability would probably have ended there, at least his liability as a principal.[34] But he did not stop; instead, he went back into the alley and started over again.

 What happened here is essentially what happened in *Spain v. United States, supra* note 30. In that case we affirmed two separate convictions when the evidence showed that the defendant fondled a young girl on the pretense that he was playing a game, then stopped when she said she "didn't want to play any more," then enticed her back onto a bed and attempted to have sexual intercourse with her. We held that because he lured the child back to the bed after she said she wanted to stop, "what happened thereafter was 'the product of a new criminal impulse ... punishable separately from the earlier act....'" *Spain,* 665 A.2d at 661

(citation omitted). The same analysis applies here. The brief but legally significant intermission in the sequence of events gave Thomas a clear opportunity to reflect on "whether to retreat or to invade another interest." *Owens,* 497 A.2d at 1096. By going back into the alley, Thomas demonstrated that he was driven by a "fresh impulse" to rape Ms. Smith again. *Id.; see also Blockburger v. United States, supra* note 31; *Robinson v. United States,* 501 A.2d 1273, 1276 (D.C.1985). His conduct thereafter was thus a new criminal act, the product of a new impulse, "punishable separately from the earlier act." *Allen, supra* note 29, 580 A.2d at 658. Consequently, there was no double jeopardy violation.

V

For the foregoing reasons, the convictions of all three appellants are

*Affirmed.*

---

*Turnbow v. State,* 451 P.2d 387 (Okla.Crim.App. 1969) (no error to incorporate into a single charge two acts of intercourse that occurred within minutes of each other but were separated by an act of oral sodomy); *Steele v. State,* 523 S.W.2d 685 (Tex.Crim.App.1975) (two acts of intercourse, one occurring in the victim's car and the other in her bedroom, were part of the same criminal transaction occasioned by continuous use of force and threats); *Bethune v. State,* 363 S.W.2d 462 (Tex.Crim.App.1962) (no election required where evidence showed several acts of intercourse occurring in the same bed on the same night); *State v. Bailey,* 144 Vt. 86, 98–99, 475 A.2d 1045, 1052–1053 (1984) (upon unanim-

ity challenge, held not plain error to include within a single count of rape at least six separate acts of intercourse occurring within a span of one and a half hours in the defendant's apartment).

**33.** Although it was not clear how long Thomas remained outside the alley, the duration of his absence was great enough to enable Ms. Smith to be raped by Walker while he was gone.

**34.** We are not here concerned with Thomas' potential liability as an aider and abettor of Gardner and Walker.